**Vanessa BAILEY, Plaintiff,**

v.

**William J. HENDERSON, Defendant.**

**No. Civ.A. 98–02224 (HHK).**

United States District Court, District of Columbia.

April 20, 2000.

Irving Kator, Kator, Scott & Parks, Washington, DC, for Plaintiff.

Michael A. Humphreys, Assistant U.S. Attorney, Office of United States Attorney for District of Columbia, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

KENNEDY, District Judge.

Vanessa Bailey, an African American woman formerly employed as a clerk with the United States Postal Service, brings this action against her former employer alleging that she suffered sex, race, and disability discrimination in her employment in violation of Title VII of the Civil Rights Act of 1964 [1] and the Rehabilitation Act.[2] Defendant is William J. Henderson, Postmaster General of the United States, who is sued in his official capacity only. Before the court is the Postal Service's motion for summary judgment. Upon consideration of the motion, the opposition thereto, and the summary-judgment record, the court concludes that the Postal Service's motion must be granted as to Bailey's disparate-treatment Title VII and disability claims. The motion must also be granted as to Bailey's hostile-work-environment Title VII claim to the extent that it is based on race. In all other respects the motion will be denied, except that the court's consideration of the proper scope of damages should Bailey prevail on the issue of liability is held in abeyance.

## I. FACTUAL BACKGROUND

When viewed in a light most favorable to Bailey,[3] the facts disclosed by the summary-judgment record are as follows. Bailey began working with the Postal Service in 1973. In September 1993, she was assigned to work in an area on the fourth floor of the Ward Place Postal Station known as the "the cage." This area is where mail that is time sensitive or contains valuable items is processed and is surrounded by fencing that permits visibility into and out of the area. When Bailey was transferred to work in the cage area, she was trained by and worked with Betty Parker. Shortly thereafter, Parker was reassigned to a duty station on another part of the fourth floor. After Parker left, another Postal Service employee, Karen Hughley, was reassigned to work in the cage area and worked there with Bailey.

Bailey's troubles began about a week after Parker's reassignment. Parker and another fourth-floor employee, Charlene Archie, began addressing Bailey profanely. Upon Bailey's arrival at work, Archie and Parker would loudly comment, "Here comes the bitch!"[4] When Archie and Parker spoke to Bailey or required her attention, they often referred to her as "bitch" or "bitch in the cage."[5] When others would come to the fourth floor with mail or questions appropriately directed to Bailey, Archie and Parker would state "give it to the bitch in the cage."[6] Parker and Archie also called Bailey "toilet-paper wipe" or "toilet-paper tongue," suggesting she was a supervisor's favorite.[7] They also said Bailey was "giving it up out of both drawer legs," a crude accusation that Bailey was sexually promiscuous.[8] On one occasion, Parker and Archie followed Bailey into the women's room and cursed at her as she used the facilities.[9]

Bailey endured Parker's and Archie's comments every working day from September 1993 through her separation from the Postal Service in May 1994. During this same period, Archie and Parker occa-

---

1. 42 U.S.C. § 2000e *et seq.*

2. 29 U.S.C. § 701 *et seq.*

3. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("evidence of the [summary-judgment] non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

4. Pl.'s Am. Fact St. ¶ 11.

5. *Id.*

6. Dep. of Vanessa Bailey ("Bailey Dep.") at 40.

7. Pl.'s Am. Fact St. ¶ 12; Bailey Dep. at 43.

8. Pl.'s Am. Fact St. ¶ 12.

9. Archie and Parker deny all of Bailey's assertions (and themselves accuse Bailey and Hughley of name-calling), while Hughley corroborates much of Bailey's account.

sionally threw mail and small items at Bailey when she approached their working space and sometimes placed objects on the floor in front of the door to the cage area, evidently hoping to cause Bailey to trip.

Bailey complained about Parker and Archie's behavior to her supervisors. When her direct supervisor, Randolph Logan, evidenced a desire to intervene and stop Archie and Parker's behavior, Bailey's second-line supervisor, Rodney Payne, an African American, told him to take no action because the problems were attributable to "just some black women going through menopause."[10] Payne did meet with Bailey, Hughley, Parker, and Archie, however. Although Logan had apparently confirmed Bailey's accusations, Payne was presented with no other witnesses or evidence regarding the conflict between the women. Payne, indicating that he could not determine what had happened or who was at fault, directed the women to cease any bothersome behavior and to remain in their respective work areas. Parker and Archie's verbal abuse continued unabated.

On May 11, 1994, Bailey suffered what she terms a "mental breakdown at work," a condition she alleges was caused by Parker and Archie's harassment.[11] The next day at work, she again felt ill and needed medical attention. She asked her acting supervisor, Stephen Jones, to drive her to the medical unit. Jones declined to do so. Immediately thereafter, Bailey took medical leave. She received, and is apparently still receiving, medical treatment and worker's compensation. On November 16, 1996, the Department of Labor classified plaintiff as having no potential for reemployment in her prior capacity.

10. Pl.'s Am. Fact St. ¶ 14.

11. *Id.* ¶ 15.

12. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

13. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. ANALYSIS

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the movant is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law."[12] The non-movant's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.[13] The non-movant is "required to provide evidence that would permit a reasonable jury to find" in its favor.[14] If the evidence is "merely colorable" or "not significantly probative," the court may grant summary judgment.[15]

### A. Title VII Claims

Title VII of the Civil Rights Act of 1964 states in relevant part that it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[16] Hardly a model of clarity, Bailey's complaint alleges two types of Title VII claims: disparate treatment on the basis of sex and race and hostile-work-environment based on sex and race. Each is considered in turn below.

#### i. Disparate Treatment Claims

Bailey claims that her supervisors treated her differently than similarly situated

14. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987).

15. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

16. 42 U.S.C.A. § 2000e–2(a)(1) (West 1994).

white male employees in two respects. First, while an appropriate protocol was in place and was followed by Payne when conflicts arose between male employees,[17] he did not follow this protocol and intercede appropriately when told of Bailey's accusations. Instead, he intervened in a most ineffective way in the conflict between Bailey and Parker and Archie, all of whom are African–American women, and counseled their direct supervisor Logan not to intercede because the female employees were merely "going through menopause." [18] Second, Bailey claims that a male acting supervisor, Stephen Jones, declined her request to drive her to receive medical treatment when she fell ill. Jones admitted in his deposition that "[a]s far as taking anyone to the medical facilities, especially female, I didn't opt to take any females in my personal car." [19]

The Postal Service argues that it is entitled to summary judgment with respect to Bailey's disparate-treatment claims because, among other reasons, she has failed to establish a prima-facie case. The Postal Service is correct.

In *McDonnell Douglas v. Green*,[20] a disparate treatment case brought against a private employer, the Supreme Court crafted the framework for analyzing Title VII cases in which the plaintiff does not have direct evidence of discrimination. Under *McDonnell Douglas*, the plaintiff first must establish a prima-facie case of discrimination based on one or more of the characteristics to which Title VII extends protection.[21] Recently, in *Brown v. Brody*,[22] the United States Court of Appeals for the District of Columbia held that federal employees, like their counterparts in the private sector, must show that they have suffered an adverse personnel action in order to establish a prima-facie case of disparate-treatment discrimination. Rejecting the plaintiff's argument that "any sort of personnel action undertaken for discriminatory reasons" constitutes an adverse personnel action,[23] the *Brody* court also held that an employer's decisions regarding the lateral transfer of an employee, where the employee suffers no diminution in pay or benefits, does not constitute an actionable injury unless "there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment ... such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." [24] This holding reflects a recognition that courts must avoid "micromanagement of business practices that would result if [courts] ruled otherwise." [25]

---

17. Payne admitted at his deposition that when he has been presented in the past with "no documentation or witnesses to verify" an employee's complaints, he first would meet with the complaining and accused employees and "listen to both sides of the story." Payne Dep. at 19, 21. He then "would ask the [employees'] supervisor, from his point of view," what to make of the allegations. *Id.* at 19. Payne would then "investigate" the situation himself by "go[ing] into [the employees'] work area and mak[ing] my observations, do[ing] daily checks, walk[ing] through the stations, and solicit[ing] any other employees, whether they witnessed these allegations or not, to use for documentation." *Id.* at 21. He would then continue his "consultations" with the employees until resolution. *Id.*

18. Pl.'s Am. Fact St. ¶ 14.

19. Dep. of Stephen Jones at 22.

20. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)

21. In a case such as this, a prima-facie case is established by a showing that (1) plaintiff is a member of a protected class; (2) she suffered an adverse employment action; and (3) similarly situated persons not in the protected class were not subject to that action. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 & n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (recognizing that the McDonnell Douglas model of a prima facie case is flexible and will vary depending on the facts of the case).

22. 199 F.3d 446, 455 (D.C.Cir.1999).

23. *Id.* at 453.

24. *Id.* at 457.

25. *Id.* at 451 (citation omitted) (insertion in original).

■ While an employer's lateral-transfer decision is not the same as an employer's decision about the appropriate way to respond to allegations of coworker harassment, they are similar in that neither action "constitutes a significant change in [an employee's] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[26] This similarity requires that both actions be governed by the rule articulated in *Brody*. Applying this rule to the facts of this case, Bailey's evidence regarding what her supervisor did or did not do in responding to her complaints does not establish that she suffered an actionable injury. Bailey's employment status was unchanged and she does not show that she suffered "materially adverse consequences affecting the terms, conditions, or privileges of her employment ... **such that a reasonable trier of fact could conclude that [she] suffered objectively tangible harm.**"[27] In this regard, it is important not to conflate two distinct issues. One issue is whether Bailey has adequately pleaded or produced evidence of the adverse-action element of her disparate-treatment cause of action. The other is whether the manner and relative vigor of the intervention by Bailey's supervisor is probative of Bailey's hostile-work-environment claim, a cause of action that does not require a showing of an adverse action but does require Bailey to show that the conduct about which she complains was based on sex and that her employer failed to take prompt and appropriate corrective action to end sexually or racially harassing conduct. The latter issue will be discussed when this court analyzes Bailey's harassment claims.

■ Bailey's disparate-treatment claim based upon her acting supervisor's refusal to take her, or any other female employee, in his car to receive medical attention fares no better. Even if the supervisor treated male employees differently, a cause of action for disparate-treatment discrimination cannot be based on this conduct because the failure to receive a courtesy—here non-employment related transportation—is not an adverse employment action.

### ii. Hostile Work Environment Claim

Bailey's hostile-work-environment claim is based on Parker's and Archie's invectives and inappropriate behavior and her supervisor's refusal to intercede appropriately as he had when he became aware of conflicts between white male employees. To establish her hostile-work-environment claim, Bailey must show that (1) she was subjected to offensive and disparaging conduct; (2) such conduct was based on sex or race; (3) such conduct was not welcomed; (4) such conduct was sufficiently severe or pervasive that a reasonable person in her position would find her work environment to be hostile or abusive; (5) at the time such conduct occurred and as a result of such conduct, plaintiff believed her work environment to be hostile or abusive; (6) her employer knew or should have known of the conduct; and (7) her employer failed to take prompt and appropriate corrective action to end the harassment.[28]

The Postal Service vigorously argues that Bailey has failed to present evidence upon which a jury could find in her favor on her hostile-work-environment claims.[29]

26. *Id.* at 456 (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

27. *Id.* at 457 (emphasis added).

28. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C.Cir.1999).

29. In a **footnote** in their reply memorandum, the Postal Service "urges the court to strike the plaintiff's affidavit in its entirety because it is rife with hearsay statements." Def.'s Reply to Mot. for Summ.J. at 12. It is elementary that requests of the court to take affirmative action of the kind requested by the Postal Service are appropriately made by motion. This is particularly true of an action that would result in judgment being entered for the requestor. For this reason alone, the court would not accede to the Postal Service's "urging." Aside from the procedural infirmi-

With respect to Bailey's sexual-harassment claim,[30] the Postal Service focuses its challenge on the part of Bailey's case that is based on Bailey's assertions that her co-workers called and referred to her as "bitch" and engaged in conduct which is not overtly sexual in nature. The Postal Service argues that:

> "assuming for the sake of argument that Archie and Parker made all of the derisive and scornful statements that Bailey accuses them of making (and did the other nettlesome things such as throwing mail at the plaintiff's feet ...), the *sine qua non* that the plaintiff's case is lacking is her ability to establish that the motive of Archie and Parker in making those comments was **to gain some advantage of a sexual nature** or alternatively, to make Bailey's work environment unpleasant or uncomfortable **because of her immutable nature as a woman.**"[31]

Further, the Postal Service points out that Bailey "conceded" in her deposition that Parker and Archie's comments were not "sexual or romantic come-ons" but were perhaps motivated by Parker's and Archie's envy that "[Bailey] **had the position they wanted and [that] they had to do other jobs.**"[32]

As primary support for its position, the Postal Service cites *Galloway v. General Motors Service Parts.*[33] In *Galloway*, a female auto worker claimed that her employer violated Title VII by failing to protect her from sexual harassment by a co-worker with whom she had previously had a romantic relationship. The coworker had repeatedly called her a "sick bitch," the "sick" apparently in reference to the plaintiff's hospitalization on two occasions for psychiatric disorders.[34] The coworker also had said "if you don't want me, bitch, you won't have a damn thing" and on one occasion "made an obscene gesture at her and said 'suck this, bitch.'"[35]

In an opinion authored by Chief Judge Posner, the Seventh Circuit affirmed the trial court's grant of summary judgment in the defendant's favor and concluded that "'sick bitch'—and, we add, the other verbal abuse, and the obscene gesture [that was directed toward the plaintiff by her coworker]—was, in context, not a sex- or gender-related term."[36] The Seventh Circuit reasoned as follows about the word "bitch":

> [It] does not necessarily connote some specific female characteristic, whether true false, or stereotypical; it does not draw attention to the woman's sexual or maternal characteristics or to other respects in which women might be thought to be inferior to men in the workplace, or unworthy of equal dignity and respect. In its normal usage, it is simply a pejorative term for "woman."[37]

█ The Postal Service's argument is without merit and its reliance on *Galloway* is misplaced.[38] As has been indicated, an

---

ty of the Postal Service's request of this court to strike plaintiff's affidavit, the Postal Service's position on the merits of the evidentiary issue it raises is at least in doubt. One example the Postal Service gives of "irredeemable hearsay" in Bailey's affidavit is Bailey's assertion that Rodney Payne told a subordinate "to leave Archie and Parker alone because they were just 'menopausal women.'" *Id.* Hearsay statements are out of court declarations that are presented to prove the truth of the matter asserted therein. Fed.R.Evid. 801(c). The court doubts that Bailey seeks to have the alleged "menopausal women" statement considered for its truth.

**30.** The court agrees with the Postal Service insofar as Bailey's hostile-work-environment claim is based on race for the reasons the

Postal Service sets forth in its summary-judgment papers.

**31.** Def.'s Mot. for Summ.J. at 12 (emphasis in original).

**32.** *Id.* at 13 (emphasis in original).

**33.** 78 F.3d 1164 (7th Cir.1996).

**34.** *Id.* at 1165.

**35.** *Id.*

**36.** *Id.* at 1167.

**37.** *Id.* at 1167–68.

**38.** None of the other cases the Postal Service cites to support its position does so. In *Neu-*

element of a Title VII sexual harassment claim is that the offending conduct was based on sex. There is not, however, a requirement that Bailey demonstrate the "motives" of her antagonists or that the conduct to which she was subjected was "sexual or romantic come-ons." A similar argument, that only conduct of a sexual nature can be the basis of a sexual-harassment suit, has been considered and rejected by several courts, including the court of appeals for this circuit.[39] In *McKinney v. Dole*, the District of Columbia Circuit stated:

> We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of an employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual overtones. And we decline to do so now. Rather, we hold that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees, if sufficiently patterned or per-

vasive, comprise an illegal condition of employment under Title VII.[40]

■ As for the Postal Service's reliance on *Galloway*, Bailey makes a salient point regarding the Seventh Circuit's parsing of the word "bitch": "it is hard to understand when such a 'pejorative term for woman,' as the Seventh Circuit terms it, could be used in a manner that does not infer (sic) hostility toward women...."[41] This court agrees. "Bitch," which means "a female canine" or "a malicious, spiteful and domineering woman"[42] clearly and objectively has gender-specific connotations. It breaks no new legal ground to state—as the Seventh Circuit acknowledges—that the use of the word "bitch" can create a hostile work environment; whether it does or not depends on the particular circumstances of the case.

■ The court holds that, in combination, the references to Bailey as "bitch" or "the bitch in the cage," Bailey's co-workers statements that she was "giving it up out of both drawer legs," her second-line supervisor's statements to her direct supervisor that he should not intercede because

ren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507 (D.C.Cir.1995), for example, the plaintiff filed suit for gender discrimination under Title VII for her termination as a senior associate with the defendant law firm. She offered direct evidence of discrimination via a partner's written evaluation of her in which the partner stated the plaintiff was "[e]xtremely difficult on secretarial and support staff. A bitch!" *Id.* at 1510. The court held that although "this pejorative term may support an inference ... [of] discriminat[ion] under different circumstances," the term "in itself ... is not always conclusive of sex discrimination" and, as used in the plaintiff's evaluation, was "grounded in gender-neutral concerns about Neuren's interpersonal relations with co-workers rather than discriminatory considerations." *Id.* at 1513. Unlike the single use of "bitch" alleged in *Neuren*, Bailey, among other things, alleges hundreds of invocations. Bailey has alleged the "different circumstances" the *Neuren* court envisioned would "support an inference" of discrimination. As with *Neuren*, the other cases the Postal Service cites are factually distinguishable from this case.

**39.** *See Hall v. Gus Const. Co.*, 842 F.2d 1010 (8th Cir.1988); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir.1987); *McKinney v. Dole*, 765 F.2d 1129 (D.C.Cir.1985).

**40.** *McKinney,* 765 F.2d at 1138.

**41.** Pl.'s Opp. to Summ.J. at 16. One is left to wonder whether the Seventh Circuit is altogether convinced that its parsing and analysis of the term "bitch" is correct. The concluding paragraph of its opinion in *Galloway* states in part:

> "[e]ven if this is wrong and there is some sexual innuendo or gender slur in 'sick bitch' that we are missing, Galloway's case falls under the bar of our *Baskerville* decision. There, as we have said, we created a safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex."

78 F.3d at 1168.

**42.** *The Merriam Webster Dictionary* 90 (5th ed. paperback 1994).

Bailey, Parker, and Archie were "just some black women going through menopause," and her second-line supervisors decision not to follow a protocol he had followed when addressing conflicts between male co-workers, provide a basis for a reasonable juror to find that the conduct about which Bailey complains was "based on sex." [43]

### B. Rehabilitation Act Claim

Bailey claims that the Postal Service violated the Rehabilitation Act and it discriminated against her and, and continues do so, on account of her psychological condition by failing to reasonably accommodate her disability. The Postal Service argues that Bailey's claim is fundamentally flawed and that it cannot be held liable on this cause of action because it did not know of her alleged disability.

■ Section 504 of the Rehabilitation Act, provides:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, *solely by reason of* his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.... [44]

This circuit has interpreted the language "solely by reason of" in the statute to require "the employer [to] have acted with an awareness of the disability itself." [45] This notice to the employer need not be explicit, but must be sufficient to serve as "an adequate, prior alert to the defendant of the plaintiff's disabled status." [46]

■ Bailey admitted in her deposition that prior to her final day at work, she never told any of her supervisors that she

had been afflicted with a psychological condition. Indeed, she herself did not learn of her ailment until May 12, 1994, her last working day. Given the nature of plaintiff's ailment, it is unreasonable to expect her supervisors to have divined it. As the Postal Service did not know of plaintiff's condition, the Postal Service could not have been motivated by it. The court must dismiss plaintiff's Rehabilitation Act claim.

### C. Damages

The Postal Service argues that the Federal Employees Compensation Act bars plaintiff from recovering compensatory damages, front pay, and back pay here because she applied for and received disability benefits. Bailey vigorously disputes this proposition. The court declines to consider the issue of the proper scope of plaintiff's damages should she prevail on the issue of liability at this time. Accordingly, this court's consideration of the damages portion of the Postal Service's motion is held in abeyance.

### III. CONCLUSION

For the foregoing reasons, it is this 19th day of April, 2000, hereby

**ORDERED** that defendant's motion for summary judgment with respect to plaintiff's disparate treatment Title VII claims is **GRANTED;** and it is further

**ORDERED** that defendant's motion for summary judgment with respect to plaintiff's race based hostile work environment claim is **GRANTED;** and it is further

**ORDERED** that defendant's motion for summary judgment with respect to plain-

---

**43.** The Postal Service also argues that it is entitled to judgment as a matter of law because "[c]orrective action was taken by management to solve plaintiff's alleged problems with her co-workers." Def.'s Mot. at 20. The evidence discerned from the summary judgment record, which must be viewed in the light most favorable to Bailey, requires that this contention be summarily rejected.

**44.** 29 U.S.C.A. § 794 (West 1999) (emphasis added).

**45.** *Crandall v. Paralyzed Veterans of America,* 146 F.3d 894, 897 (D.C.Cir.1998).

**46.** *Id.* at 898.

tiff's sex based hostile work environment claim is **DENIED;** and it is further

**ORDERED** that defendant's motion for summary judgment with respect to plaintiff's Rehabilitation Act claim is **GRANTED;** and it is further

**ORDERED** that defendant's motion for summary judgment with respect to the issue of the scope of damages should plaintiff prevail is held in abeyance.